IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 22-CR-0001-CJW |
| | ) | |
| vs. | ) | |
| | ) | |
| DOUG HARGRAVE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S SENTENCING BRIEF**

**TABLE OF CONTENTS**

I.    BACKGROUND ..................................................................................1

II.   A FOURTEEN-LEVEL INCREASE FOR LOSS APPLIES ...................... 10

III.  A TWO-LEVEL ENHANCEMENT FOR ABUSE OF TRUST
      APPLIES............................................................................................ 18

IV.   THE COURT SHOULD ORDER RESTITUTION AS RECOMMENDED
      BY THE PSR ...................................................................................... 22

V.    CONCLUSION ................................................................................... 23

I.    **BACKGROUND**

The United States anticipates the uncontested portions of the PSR and

evidence at the sentencing hearing will establish the following facts by a

preponderance of the evidence. *See United States v. Mustafa*, <u>695 F.3d 860, 862</u>

(8th Cir. 2012).

1

Go Cedar Rapids ("GoCR") was a nonprofit organization whose primary function was to promote Cedar Rapids, Iowa as a desirable place for business, travel, tourism, and events. (PSR ¶ 7; Ex. 10 at 2). GoCR was originally incorporated in 1982 as the "Cedar Rapids Area Convention and Visitors Bureau." (Ex. 10 at 1). The organization adopted the name "Go Cedar Rapids" in 2016. (Ex. 10 at 1).

GoCR planned and staged Newbo Evolve, a three-day music and cultural event held in Cedar Rapids in August 2018. (PSR ¶ 8). Newbo Evolve featured concerts by Maroon 5 and Kelly Clarkson, as well as other attractions. (PSR ¶ 8).

Defendant was formerly the GoCR Board treasurer and later the vice chairman of GoCR's Board of Directors. (PSR ¶ 10). In July 2018, defendant became GoCR's full-time finance director. (PSR ¶ 10). His responsibilities included updating Newbo Evolve's budget. (PSR ¶ 10). Aaron McCreight was President and Chief Executive Officer ("CEO") of GoCR. (PSR ¶ 9). His responsibilities included overseeing the planning and staging of Newbo Evolve. (PSR ¶ 9). McCreight provided progress reports on Newbo Evolve to the GoCR Board and the GoCR Executive Committee at meetings throughout 2017 and 2018, which at times included budget and ticket sales information. (PSR ¶ 9).

In December 2017, a bank located in Cedar Rapids, "the lending bank," extended a $1.5 million revolving line of credit to GoCR to fund Newbo Evolve. (PSR ¶ 13). In its request for this initial loan, GoCR estimated it would sell 11,000 tickets for the Kelly Clarkson concert; 11,000 tickets for the Maroon 5 concert; and

2

4,000 three-day Newbo Evolve passes.  (PSR ¶ 13).  McCreight signed the $1.5 million promissory note for this loan in his capacity as President and CEO of GoCR.  (PSR ¶ 13).  The terms of the loan required GoCR to provide financial information, including ticket sales, upon the lending bank's request.  (PSR ¶ 13).

On February 9, 2018, GoCR began selling Newbo Evolve tickets to the public through a ticket vendor.  (PSR ¶ 14).  McCreight and other GoCR employees received regular ticket sales updates from the ticket vending company.  (PSR ¶ 14).

On April 2, 2018, defendant provided a Newbo Evolve budget to the lending bank projecting a $335,909.66 profit.  (PSR ¶ 15).  On April 11, 2018, McCreight shared a budget package with the GoCR Board's Executive Committee that similarly projected Newbo Evolve would generate a profit of $335,909.66.  (PSR ¶ 16).  The minutes from this meeting stated that it was "[t]ime to start considering contingency plans to cut costs and increase income with additional sponsorship dollars."  (PSR ¶ 16).

On May 14, 2018, McCreight and defendant provided to the lending bank a Newbo Evolve budget projecting a significantly lower profit of $3,193.66.  (PSR ¶ 17).  That day, in a meeting with the representatives from the lending bank, McCreight falsely reported to the lending bank that 6,000 tickets had been sold for Maroon 5's performance and 2,500 tickets had been sold for Kelly Clarkson's performance.  (PSR ¶ 17).  In reality, as of May 14, 2018, approximately 4,715 tickets had been sold and/or provided free of charge ("comped") to vendors and

3

advertisers for Maroon 5's performance and approximately 1,834 tickets had been sold and comped for Kelly Clarkson's performance. (PSR ¶ 17).

On June 1, 2018, McCreight and defendant provided to the lending bank a Newbo Evolve budget projecting a profit of $84,703.66. (PSR ¶ 19). However, sometime around June 11, 2018, defendant informed McCreight and the GoCR Board chairman that Newbo Evolve's updated budget was projecting a loss of more than $1.1 million. (PSR ¶ 20; Ex. 6). Despite the projected loss, on June 14, 2012, GoCR drew down or took an advance in the amount of $225,000 from the loan with the bank. (PSR ¶ 21). On or about June 15, 2018, the GoCR Board Chair directed McCreight to find ways to cut Newbo Evolve's budget to reduce the newly projected $1.1 million loss to, at most, a loss of $250,000. (PSR ¶ 22).

On June 20, 2018, at a GoCR board meeting, McCreight presented a Newbo Evolve budget projecting a loss of $644,846.34. (PSR ¶ 23). The GoCR Board was informed that "just under 6,500 total tickets" had been sold, "[t]he budget is very tight," and that Newbo Evolve would be "short at the end but there is nothing left to cut." (PSR ¶ 23). The Newbo Evolve budget projecting a $644,846.34 loss was not provided to the lending bank. (PSR ¶ 23).

As the Newbo Evolve event dates approached, GoCR did not have enough money to, among other things, pay Kelly Clarkson, pay production costs, and buy the alcohol that was to be sold at the concert venue. (PSR ¶ 24). Without additional funding, Newbo Evolve would have to be cancelled. (PSR ¶ 24). Defendant and McCreight sought additional financing from several new potential high-risk lenders

4

or lenders of last resort. (PSR ¶ 23; Ex. 7). These other potential lenders did not agree to loan the money needed to prevent Newbo Evolve's cancellation. (PSR ¶ 24).

After failing to secure new loans, McCreight and defendant ultimately sought additional financing from the lending bank. (PSR ¶ 24). On or about July 15, 2018, McCreight and defendant discussed the need to send a Newbo Evolve budget to the lending bank in support of GoCR's request to increase its loan amount from $1,500,000 to $1,750,000. (PSR ¶ 25). McCreight told defendant that they did not want to show the bank the projected Newbo Evolve loss because the bank would not loan GoCR any additional funds for Newbo Evolve. (PSR ¶ 25).

On July 16, 2018, defendant, at McCreight's direction, emailed a false and fraudulent "Newbo Evolve 2018 Budget" to the lending bank in support of GoCR's request for an increase in its loan from the lending bank. (PSR ¶ 26). Defendant and McCreight knew this false and fraudulent Newbo Evolve 2018 Budget falsely, fraudulently, and materially overstated Newbo Evolve's expected ticket sale revenues; falsely, fraudulently, and materially understated Newbo Evolve's expected expenses; and falsely, fraudulently, and materially overstated Newbo Evolve's expected profit to be $65,653.66. (PSR ¶ 26). McCreight also knew this false and fraudulent budget overstated expected sponsorship revenues. (PSR ¶ 26). At the time defendant emailed this budget to the lending bank, McCreight and defendant believed Newbo Evolve was not going to make any profit and, instead, would lose a substantial amount of money. (PSR ¶ 26).

5

On July 16, 2018, in a meeting with representatives of the lending bank, McCreight falsely represented to the lending bank that 9,000 tickets had been sold for Maroon 5's performance and 6,000 tickets had been sold for Kelly Clarkson's performance. (PSR ¶ 27). In fact, as of July 16, 2018, approximately 5,651 tickets had been sold for Maroon 5's performance and approximately 2,081 tickets had been sold for Kelly Clarkson's performance. (PSR ¶ 27).

On July 18, 2018, at a GoCR Board meeting, McCreight falsely represented to the GoCR Board that "[i]n the last week and a half ticket sales have spiked," and that 9,000 tickets had been sold for Maroon 5's performance and 6,000 tickets had been sold for Kelly Clarkson's performance. (PSR ¶ 28). In fact, as McCreight well knew, ticket sales had not "spiked" in the period from July 1 through July 16, 2018. (PSR ¶ 28). Moreover, as of July 18, 2018, approximately 5,703 tickets had been sold for Maroon 5's performance and approximately 2,095 tickets had been sold for Kelly Clarkson's performance. (PSR ¶ 28). McCreight and defendant did not share with the GoCR Board the false and fraudulent Newbo Evolve 2018 Budget projecting a $65,653.66 profit that defendant had provided to the lending bank two days prior. (PSR ¶ 28).

On July 19, 2018, in reliance on the false and fraudulent representations about Newbo Evolve's budget, the lending bank approved a new and substituted loan of $1,750,000 from the lending bank. (PSR ¶ 29). The terms of the $1.75 million promissory note made clear that the new note replaced the original $1.5 million promissory note: "This Note replaces that certain Promissory Note dated

December 15, 2017, in the amount of $1,500,000.00 between Borrower and Lender to mature August 15, 2018." (Ex. 3 at 2). As a consequence of the fact that GoCR already owed $1.5 million to the lending bank under the terms of the old loan, GoCR received $250,000 in additional loan funds from the bank. (PSR ¶ 29).

On July 31, 2018, McCreight and defendant sought yet another increase in the loan amount from the lending bank for production costs, food and beverage costs, session talent and petty cash. (PSR ¶ 30). In connection with and in support of this loan increase request, McCreight and defendant made the false representation to the lending bank that the previously provided false and fraudulent Newbo Evolve 2018 Budget dated July 16, 2018, which projected a $65,653.66 profit was still in effect with one change: the sponsorships revenue projection was $250,000 lower than the sponsorships projection in the budget previously provided to the lending bank. (PSR ¶ 30). In truth, as McCreight and defendant well knew (1) Newbo Evolve was not going to receive $1,790,672.66 in Concert Sales Income as projected in the July 16, 2018, budget; (2) Newbo Evolve was going to spend more than $475,000 on Production Expense as projected in the July 16, 2018, budget; and (3) Newbo Evolve was not going to lose only approximately $200,000, and instead was going to lose at least $640,000 and likely much more. (PSR ¶ 31).

On August 1, 2018, again in reliance on false and fraudulent representations about Newbo Evolve's budget, the lending bank approved a new and substituted loan of $2,200,000 from the lending bank. (PSR ¶ 32). The terms of the $2.2 million

7

promissory note made clear that the new note replaced the previous $1.75 million promissory note: "This Note replaces that certain Promissory Note dated July 19, 2018, in the amount of $1,750,000.00 between Borrower and Lender to mature August 15, 2018." (Ex. 4 at 2). As a consequence of the fact that GoCR already owed $1.75 million to the lending bank under the terms of the previous loan, GoCR received $450,000 in additional loan funds from the lending bank. (PSR ¶ 32).

As a result of the fraud, Newbo Evolve took place as scheduled with Maroon 5 and Kelly Clarkson performing as planned in August 2018. (PSR ¶ 33). Ultimately, Newbo Evolve lost more than $2 million. (PSR ¶ 33). Consequently, GoCR was unable to repay much of its loan from the lending bank when the loan was due. (PSR ¶ 33).

In emails to the GoCR Board Chairman shortly after Newbo Evolve, defendant made several statements regarding misrepresentations to the lending bank. (PSR ¶ 34). On August 13, 2018, defendant stated "the decision was passed along that we did not want to show a loss as the fear was the bank would not extend us any additional funds." (PSR ¶ 34). In an email from August 15, 2018, defendant admitted to sending the lending bank a Newbo Evolve budget projecting an approximately $65,000 profit, which he attached to the email. (PSR ¶ 34).

On August 20, 2018, in a meeting with the GoCR Board Chairman and the GoCR Board Treasurer, McCreight falsely stated that he and Hargrave had shown the lending bank the Newbo Evolve budget projecting an approximately $644,000 loss. (PSR ¶ 35). McCreight stated that he told defendant to send the "same

budget" and disclaimed any responsibility for the lending bank receiving a different budget than the GoCR Board, saying "not by me."  (PSR ¶ 35).

FBI agents interviewed defendant several times in 2021.  (PSR ¶ 37).  In an interview on February 25, 2021, defendant stated that the Newbo Evolve budget showing an approximately $644,000 loss "would have been presented" to the lending bank during one of the meetings he and/or McCreight had with them.  (PSR ¶ 37).  Defendant also admitted that he did not believe the expected profit of $65,653.66 shown in the July 16, 2018, Newbo Evolve budget would come to fruition.  (PSR ¶ 37).  In a subsequent interview on July 27, 2021, defendant falsely stated that changes he made to the production expenses in the Newbo Evolve budget showing an expected profit of $65,653.66 were based on his understanding that the concerts were going to be moved indoors to the US Cellular Center.  (PSR ¶ 37).  Defendant also falsely stated that at the time he sent the July 16, 2018, Newbo Evolve budget to the lending bank he genuinely believed that Newbo Evolve would make a profit of approximately $65,000.  (PSR ¶ 37).

Due to the failure of Newbo Evolve, approximately 97 vendors that provided services for Newbo Evolve did not receive full payment.  (PSR ¶ 39).   The vendors lost approximately $800,000 as a result of the fraud.  (PSR ¶ 39).

Left with "no cash reserves or meaningful physical assets," GoCR folded. (Ex. 9).

After receiving $757,768.75 from income that Newbo Evolve did produce, the lending bank lost $1,442,231.25 on GoCR's defaulted promissory note.  (PSR ¶ 40).

## II.     A FOURTEEN-LEVEL INCREASE FOR LOSS APPLIES

Section 2B1.1(b)(1)(H) of the Sentencing Guidelines instruct the Court to apply a fourteen-level increase to defendant's base offense level if defendant is responsible for more than $550,000 but less than $1.5 million in loss.  In paragraph 44 of the PSR, the United States Probation Office finds that defendant is responsible for a loss amount of $1,442,231.25.  Defendant objects and asserts he is responsible for only $13,803.49 in loss, and so only a two-level increase should apply.[1]

As explained below, there are at least three independent grounds for assessing a fourteen-level increase for loss: (1) $1,442,231.25, which is the value of the fraudulent $2.2 million promissory note reduced by what the lending bank recovered; (2) $925,000, the value of three fraudulent disbursements of loan funds; and (3) $700,000, the two disbursements for which defendant admits responsibility. Accordingly, defendant's objection is without merit, and the Court should overrule it.

Loss is defined as the greater of actual loss or intended loss.  USSG §2B1.1, comment. (n.3(A)).  "Actual loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense."  USSG §2B1.1, comment. (n.3(A)(i)).  "Reasonably foreseeable pecuniary harm" means "pecuniary harm that the defendant knew or,

---

[1] In his objections, defendant erroneously states a four-level increase should be applied based on his loss calculations.  (Doc. 19 at 5).  However, the loss he asserts, $13,803.49, would result in a two-level increase under USSG §2B1.1(b)(1)(B) rather than a four-level increase.

10

under the circumstances, reasonable should have known, was a potential result of the offense. USSG §2B1.1, comment. (n.3(A)(iv)). The court is to reduce loss by money returned to the victim by the defendant before the detection of the offense. USSG §2B1.1, comment. (n.3(E)(i)). In calculating the loss, "[t]he court need only make a reasonable estimate of the loss." USSG §2B1.1, comment. (n.3(C)).

Here, the total loss is $1,442,231.25, the total value of the loan reduced by what the bank recovered. *See* USSG §2B1.1, comment. (n.3(E)(i)). Each subsequent promissory note issued on the line of credit to GoCR stated that it replaced the previous note: "This Note replaces that certain Promissory Note dated [date], in the amount of [amount] between Borrower and Lender to mature [date]." (Ex. 3; 4). Defendant and McCreight obtained a $2,200,000 promissory note from the lending bank based on a fraudulent loan application that grossly inflated profits and underreported expenses. The appropriate calculation of the actual loss is the total value of the loan reduced by what the bank recovered.

The Eighth Circuit Court of Appeals has affirmed this method of calculating loss in fraudulent loan cases. In *United States v. Rubashkin*, a case involving loans extended based on applications that included inflated collateral, the sentencing court had "calculated the loss amount as the unpaid balance on the Agriprocessors loan minus the bank's recovery in bankruptcy proceedings." 655 F.3d 849, 867 (8th Cir. 2011). As the Eighth Circuit noted in affirming the sentencing court, "[t]he purpose of collateral is to protect a lender in the event of a borrower's default." *Id.* at 868. "The relevant guideline commentary provides that our first consideration

11

should be how much protection the collateral actually provided." *Id.* (citing USSG §2B1.1, comment. (n.3(E)(ii))).

In this case, the bank's recovery amounted to $757,768.75. It is undisputed that GoCR borrowed $2.2 million to put on the event, which generated $757,768.75 in revenue. Pursuant to application note 3, this amount is credited against the $2,200,000 loss, resulting in an actual loss amount of $1,442,231.25.

In his objections, defendant ignores the loss sustained by the lending bank and asks the Court to begin by limiting loss to two of the three[2] fraudulent disbursements of funds from the bank—specifically, $250,000 on July 19, 2018, and $450,000 on August 1, 2018, totaling $700,000. (Doc. 19 at 2-5). From those disbursements, defendant requests improper credits, and he asks the Court to adopt a profit and loss analysis of only those two disbursements, essentially asking the Court to ignore the rest of the event. Through this creative accounting, he asserts his loss is not $1,442,231.25, not $925,000, not $700,000, but a mere $13,803.49.

Defendant's argument has no basis in law or fact. First, defendant argues the two fraudulent disbursements were necessary so he could generate any positive return at all. In essence, defendant contends that he had to obtain $700,000 in fraud money, in addition to $1.5 million already spent, to generate the $757,768.75

---

[2] Defendant claims he is not responsible for the $225,000 fraudulent disbursement on June 14, 2018. (PSR ¶¶ 21, 44). However, as explained below, defendant was engaged in fraudulent conduct by this date. He sent a fraudulent Newbo Evolve budget to a prospective lender, United Capital, on June 11, 2018. (Ex. 6; 7).

return. Defendant then attempts to whittle down the $700,000 fraudulent distributions to only $13,803.49.

In doing so, defendant asserts he should (1) receive credit for fraud money spent on what he terms "necessary expenses," and (2) any income those fraud funds produced. These assertions are speculative and factually incorrect.

First, regarding the $250,000, defendant claims these funds were entirely spent on Kelly Clarkson because she had a contractual right to cancel her concert if these funds were not remunerated to her. However, assuming she would have cancelled, that would have been a matter of a civil, rather than criminal, loss. Defendant lied to the bank to obtain $250,000, and now he wants additional credits against that loss for avoiding a civil loss had her concert been cancelled and, potentially, caused some of the three-day passes to be subject to cancellation. Principally, defendant argues that the fraudulent $250,000 guaranteed $248,271.16 in concert revenue from tickets for Kelly Clarkson's concert and a speculative $80,080 in three-day passes not cancelled or refunded.

Defendant's reasoning is flawed. As an initial matter, Kelly Clarkson's contract totaled $500,000, not $250,000. (Ex. 8). Thus, even assuming defendant could parse the Newbo Evolve loss in the manner he proposes, that particular concert did not generate the profit defendant claims. The sum of $328,351.16 in "total revenue," (Doc. 19 at 2), minus $500,000 equals a $171,648.84 loss. Moreover, this line-item loss accounting defendant suggests is misleading because it does not account for other costs, such as the stage, the vendors, and other day-of expenses

13

that might have been avoided had defendant not committed fraud. Had defendant been honest with the lending bank, the bank could have called for the cancellation of the event and participated in recouping what had been spent of the original $1.5 million. It certainly could have avoided increasing its expenditures to $2.2 million.

Second, defendant argues the $450,000 August 1, 2018 increase in the line of credit was primarily for food, beverages, and other services necessary for the concerts to go forward. Defendant then performs a similar profit-and-loss analysis on these funds, deducting $118,888.09 in "net profit" realized from food and beverage sales. (Doc. 19 at 4). Defendant conveniently ignores the fact that many of the food and beverage vendors were never paid. Accounting for that fact, food and beverages realized no profit. Once again, defendant's calculations fall apart upon examination.

Defendant should not be permitted to line item away his loss. If defendant wanted to engage in such a back and forth, he should have been transparent with the lending bank and had those arguments in civil court instead of causing the bank to expend additional funds based on fraudulent representations. The total loss to the bank based on defendant's fraud is ascertainable and in a straightforward manner. Newbo Evolve cost the lending bank $2.2 million, and the bank recovered $757,768.75, resulting in a loss under the guidelines of $1,442,231.25. *See Rubashkin*, 655 F.3d at 867. These figures do not even account for the loss to the 97 vendors who lost $800,000. But for defendant's fraud, the bank would have been out $1.275 million dollars expended on the original promissory note, some of which

14

the bank may have been able to recoup, and the 97 vendors would not have incurred an additional $800,000 in losses.

Thus, defendant's loss argument rests on a fallacy. The unspoken thesis of defendant's argument is that he needed to commit the fraud to get more money from the bank to be able to return money to the bank. Not only is this entirely illogical, approving defendant's loss methodology would be tantamount to excusing his offense.

Defendant cites no authority for his method of calculating loss by line item and then combining those line items to arrive at a final loss calculation.

To the contrary, "necessary" expenses cannot be credited against loss. The Eighth Circuit has "rejected the argument that one who commits a fraud is entitled to his business expenses 'in perpetrating a fraud.'" *United States v. Craiglow*, <u>432 F.3d 816, 820</u> (8th Cir. 2005); *see United States v. Spalding*, <u>894 F.3d 173, 191</u> (5th Cir. 2018) (affirming loss calculation that was reduced by small amount repaid to investors and concluding that "[n]o further discounts were warranted because Spalding returned his victims nothing else of value, notwithstanding his putative 'legitimate business expenses'"); *United States v. Byors*, <u>586 F.3d 222, 226</u> (2d Cir. 2009) ("The Guidelines do not require a loss to be offset by any legitimate expenditures, as defendant argues, but rather by 'value' that has been conferred on victims in the form of money or property returned or services rendered"). Defendant committed fraud to use the bank's money to put on Newbo Evolve and in

15

doing so he caused the bank to suffer a loss in excess of a million dollars. He cannot deduct the expenses of putting on the event from the bank's loss.

Defendant's argument is also an attempt to lessen his responsibility for the loss the bank suffered. He disclaims knowledge of the false representations made by defendant McCreight to the bank regarding the number of tickets actually sold for the event. Though his point is not entirely clear, his apparent claim is that, in securing the additional funds from bank, he intended the bank to suffer no loss because he could not anticipate the exact revenue that Kelly Clarkson would generate and it was possible that the concert would make money. (Doc. 19 at 5).

Contrary to defendant's claims, defendant was well aware that Newbo Evolve was going to lose a substantial amount of money. As defendant stipulated in his plea agreement, when he and defendant McCreight sought more funds from the bank, they both knew that Newbo Evolve was going to lose "at least $640,000 and likely much more." (Doc. 14 at 9, ¶ 13.V).

Around June 11, 2018, defendant told McCreight and the GoCR Board chairman that Newbo Evolve was going to lose $1.1 million. (PSR ¶ 20). An internal Newbo Evolve budget dated June 11, 2018, shows that projected $1.1 million loss. (Ex. 6). At nearly the same time, defendant was communicating with United Capital, one of the other "potential lenders" referenced in paragraph 24 of the PSR, about financing for Newbo Evolve. (Ex. 7 at 1). On June 11, 2018, at 10:57 p.m., defendant sent United Capital a Newbo Evolve budget projecting a profit of $154,653.66. (Ex. 7 at 1-2). That budget was false, and defendant knew it.

16

In reality, after cutting costs as much as possible, GoCR was only able to reduce the projected loss to $644,846.34. (PSR ¶ 23). The bank never received the budget projecting the $644,846.34 loss. (PSR ¶ 23). Instead, despite the substantial loss they were already anticipating, defendant and McCreight went back to the bank and lied to secure more funding, resulting in a new promissory note for $1,750,000 on July 19, 2018, and then the final pre-event promissory note of $2,200,000 on August 1, 2018. (PSR ¶¶ 25-32).

Alternative loss calculations result in the same fourteen-level enhancement under USSG §2B1.1. First, defendant was participating in the fraud no later than June 11, 2018, when he sent a fraudulent budget to United Capital. After that date, the bank sent three disbursements of funds to GoCR for Newbo Evolve, totaling $925,000: $225,000 on June 14, 2018; $250,000 on July 19, 2018; and $450,000 on August 1, 2018. (PSR ¶¶ 21, 29, 32). Even if the funds the bank already sent to GoCR are discounted, defendant's loss amount is still not less than $925,000. Second, defendant essentially concedes responsibility for the two disbursements of $250,000 and $450,000. (Doc. 19 at 2). His attempts to take credits from those amounts fail for the reasons above. A loss of $700,000 results in the same guideline calculation. Third, as defendant stipulated, at the time he and McCreight made false representations to the bank, he knew Newbo Evolve was going to lose at least $640,000 and likely much more. (Doc. 14 at 9, ¶ 13.V.) A $640,000 loss also results in the application of the fourteen-level enhancement.

In sum, the fourteen-level enhancement for loss clearly applies. Despite defendant's attempts to complicate the loss analysis in this case, the facts are straightforward. Defendant and his coconspirator, McCreight, lied to the bank to obtain a $2,200,000 loan they knew could not be repaid. The bank recovered $757,768.75 and lost $1,442,231.25, which is a reasonable estimate of the loss under the sentencing guidelines. The Court should overrule defendant's objection and assess a fourteen-level increase for loss as scored in the PSR.

## III.    A TWO-LEVEL ENHANCMENT FOR ABUSE OF TRUST APPLIES

The Court should apply a two-level enhancement for abuse of trust under USSG §3B1.3 because defendant abused a position of private and public trust.[3] Defendant abused the trust of his employer, GoCR, a nonprofit organization that performed a public function. His actions caused GoCR's closure. As explained below, because defendant's position within GoCR significantly facilitated the commission and concealment of the offense, the enhancement applies.

Section 3B1.3 of the Sentencing Guidelines instructs the Court to apply a two-level increase "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to

---

[3] The United States Probation Office scored this enhancement in the draft PSR, (Doc. 18 ¶ 46), but then deleted it from the final PSR, (Doc. 21 ¶ 46). As noted in the final PSR, the United States objected to its removal. (Doc. 21 ¶ 46).

significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

USSG §3B1.3, comment. (n.1).

"[T]he government must prove two elements by a preponderance of the evidence in order for the abuse of trust enhancement to apply: (1) defendant occupied a position of private [or public] trust, and (2) defendant used this position in a manner that significantly facilitated the commission or concealment of the offense." *United States v. Miell*, 661 F.3d 995, 998 (8th Cir. 2011). The application of this enhancement "is fact intensive because it turns on the precise relationship between the defendant and her victims and therefore cannot be decided on the basis of generalities." *Id.* (quoting *United States v. Jenkins*, 578 F.3d 745, 753 (8th Cir. 2009)).

Courts have determined that the enhancement applies to accountants or similar senior managers or executives entrusted with an organization's finances. *See United States v. Hendricks*, 434 F. App'x 812, 814 (11th Cir. 2011) (per curiam) (affirming application of enhancement to a business manager and accountant of a nonprofit organization); *United States v. O'Connell*, 252 F.3d 524, 526, 529 (1st Cir. 2001) (determining an office manager and bookkeeper of a fabric company who had

19

been delegated much of the financial operations of the company abused a position of trust); *United States v. Hernandez*, 231 F.3d 1087-88, 1091 (7th Cir. 2000) (finding abuse-of-trust enhancement applied to a staff accountant of an electronics corporation); *United States v. Deal*, 147 F.3d 562, 563-64 (7th Cir. 1998) (affirming determination that comptroller who maintained financial books and records abused a position of trust); *United States v. Bartleson*, 74 F. Supp. 3d 947, 967-971 (N.D. Iowa 2015) (finding co-owner who acted as a vice-president, secretary, and treasurer who was trusted to accurately account for company finances and payroll abused a position of trust).

Here, defendant abused a position of private trust that he held with respect to GoCR. Defendant was the organization's full-time finance director, a position of substantial "professional and managerial discretion." *See* USSG §3B1.3, comment. (n.1). As its finance director, defendant was essentially the organization's accountant and Chief Financial Officer. He had a fiduciary duty to act in the best interest of the organization, especially with regard to its finances. Instead, he committed a fraud that bankrupted it. In perpetrating a fraud upon GoCR's lender that negatively impacted the organization's finances, defendant acted in contravention to the fiduciary duty he owed to GoCR.

Defendant's position as GoCR's finance director also significantly facilitated the offense. He sent the fraudulent budget to the lending bank in his capacity as finance director. As the person responsible for the Newbo Evolve budget, his position was necessary to carry out the fraud that ultimately collapsed GoCR.

In his objection to the application of this enhancement, defendant cited *United States v. Rubashkin*, 718 F. Supp. 2d 953 (N.D. Iowa 2010) and *Miell*, 661 F.3d at 998. (Doc. 19 at 5).

*Rubashkin* is inapposite. In *Rubashkin*, the defendant, a vice-president of a for-profit corporation, overstated accounts receivable and diverted customer payments that were supposed to be held in trust for the bank. 718 F. Supp. 2d at 964-965. The Court declined to the apply the abuse of trust enhancement because the transactions between the defendant and the victim–banks were part of an arms-length commercial relationship. *Id*. at 981.

*Miell* likewise has limited to no application here. That case examined the nature of the relationship between a landlord and his tenants, concluding that the landlord was in a position of power relative to the tenants. 661 F.3d at 999.

Neither an imbalance of power nor an arm's length commercial relationship is at issue. Here, defendant was a senior employee and fiduciary who was in a position of trust relative to GoCR. His fraudulent actions directly harmed that organization. This abuse of his position makes the enhancement applicable.

In addition, defendant abused a position of public trust with respect to the City of Cedar Rapids. The City of Cedar Rapids provided $500,000 to GoCR for the funding of Newbo Evolve. (Ex. 12 at 2). GoCR's sole purpose and stated mission was to promote and enhance Cedar Rapids:

> Our Mission: GO Cedar Rapids is dedicated to enhancing the local economy by promoting the Cedar Rapids area as the premier destination in the region for travel, tourism and events.

21

> Our Vision: GO Cedar Rapids is the destination's go-to organization for promotion, collaboration and innovation.

(Ex. 11 at 2). Defendant thus was the finance director of the City's tourism bureau. The City provided funding for Newbo Evolve trusting that defendant would be a faithful steward of those funds and put on an event that would showcase and benefit the City of Cedar Rapids. Conversely, defendant's fraud bankrupted GoCR, leaving the City without the convention and visitors' bureau it had had since 1982.

The Court should find that defendant abused a position of private and public trust and apply the two-level enhancement under USSG §3B1.3.

## IV. THE COURT SHOULD ORDER RESTITUTION AS RECOMMENDED BY THE PSR

The United States Probation Office recommends that defendant be ordered to pay $1,442,231.25 in restitution joint and severally with Aaron McCreight. (PSR ¶ 98). Defendant's objection to the amount of restitution is entirely premised on his arguments regarding loss, which fail for the reasons explained above. This is an actual loss case. Even if the Court finds a loss amount less than $1,442,231.25, that should not change the restitution amount. Defendant's fraud induced the lending bank to incur additional losses to itself, not to mention 97 other vendors. The event deprived the victim–bank of $1,442,231.25. Accordingly, the amount of restitution should equal the actual loss suffered by the victim. *See United States v. Gammell*, 932 F.3d 1175, 1180 (8th Cir. 2019) (noting that restitution awards are tied to actual loss).

Here, the actual loss is $1,442,231.25. The Court should order restitution as recommended in the PSR.

22

## V. CONCLUSION

The Court should (1) apply a fourteen-level increase for loss; (2) impose a two-level enhancement because defendant's offense involved the abuse of a position of trust; and (3) order restitution as recommended in the PSR.

Respectfully submitted,

TIMOTHY T. DUAX
United States Attorney

By: */s/ Kyndra Lundquist*

KYNDRA LUNDQUIST
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, IA 52401-2101
319-363-6333
319-363-1990 – Fax
Kyndra.Lundquist@usdoj.gov

CERTIFICATE OF SERVICE
I hereby certify that on February 9, 2023, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the parties or attorneys of record.
UNITED STATES ATTORNEY
BY: /s/ KAL_____