IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 22-CR-0001-CJW |
| | ) | |
| vs. | ) | |
| | ) | |
| DOUG HARGRAVE, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESISTANCE TO DEFENDANT'S SENTENCING MEMORANDUM AND MOTIONS FOR DOWNWARD DEPARTURE AND VARIANCE**

In his sentencing memorandum, defendant asks the Court to find a loss amount of only $13,803.49. (Doc. 31-1 at 22). Defendant also moves the Court to depart and vary downward from the advisory guidelines range. (Doc. 30). The United States resists those requests and offers this brief and the attached exhibits in support of its resistance.

**I.  Government Exhibits**

13.  Box Office Statement Showing Final Ticket Sales

14.  2017 Email from M.S. Regarding Ticket Prices

**II.  The Court Should Assess a Fourteen-Level Enhancement for Loss**

As explained in the government's sentencing brief, defendant's method for calculating loss fails as a matter of law and fact. (Doc. 37-1 at 10-18).

In addition to those arguments and in response to defendant's sentencing memorandum, the government notes that GoCR never calculated the Newbo Evolve

1

profits and losses by artist. *See* (Ex. 6, 7 at 2; Def. Ex. V). Doing so would not make sense. Instead, GoCR used a profit and loss statement with fixed overhead and never divided out expenditures by artist. Defendant now attempts such an accounting despite the fixed overhead. He also attempts to divide revenue by artist. As a matter of accounting, profits and losses for an event like Newbo Evolve are simply not calculated in this manner, which is shown by the Newbo Evolve budgets contained within both parties' proposed exhibits.

Defendant's calculations are also incorrect. Defendant states that "[t]otal revenue from the individual ticket sales for the Kelly Clarkson contract amounted to $248,271.16." (Doc. 31-1 at 9). However, that number includes sales tax, which defendant failed to deduct. (Ex. 13 at 1). Sales tax is not profit because it does not remit to the seller or, in this case, the lending bank. The box office statement shows the Kelly Clarkson revenue without sales tax, which is $232,029.12. (Ex. 13 at 2). But that number also includes a portion of the revenue from the three-day passes. (Ex. 13 at 2). GoCR sold 607 three-day passes. (Ex. 13 at 2, showing 607 as the total of the paid column of the three-day passes). Concertgoers purchased 1,862 Kelly Clarkson tickets. (Ex. 13 at 1). Looking at the second page of government exhibit 13, the box office statement, the total shown in the paid column for Kelly Clarkson is 2,469 tickets. (Ex. 13 at 2). This is because the total on the box office statement, 2,469 tickets, includes the 607 three-day passes. (Ex. 13 at 2). As shown on the statement, the revenue from the three-day passes was split between Kelly Clarkson, Maroon 5, and the remainder of the three-day event. (Ex. 13 at 2,

showing $161 per three-day pass as part of the box office total for Kelly Clarkson). Thus, in calculating an average ticket price, multiplying it by the number of three-day passes, and adding that number to revenue from Kelly Clarkson, (Doc. 31-1 at 10), defendant is double counting the three-day passes. Revenue from three-day pass sales was already included the total Kelly Clarkson revenue, $232,029.12. Accordingly, Kelly Clarkson's concert did not generate a profit as defendant claims. Her contract was $500,000, and the revenue from her concert was $232,029.12, meaning that that concert lost at least $267,970.88.

Furthermore, defendant's argument that GoCR would have had to refund three-day passes, (Doc. 31-1 at 10), is also not accurate because the money for the three-day passes was held in escrow until the time of the event. (Ex. 14). Thus, defendant did not save anyone any money. Since the money from ticket sales was in escrow, if refunds would have been required, the money would have been returned to the ticket purchasers. Thus, defendant's fraud regarding the $250,000 fraudulent loan amount did not save GoCR or the lending bank any money by avoiding refunds of three-day passes.

Finally, defendant's claims regarding the final fraudulent loan disbursement of $450,000, (Doc. 31-1 at 10-13), lack factual support. He argues that $450,000 in fraud proceeds was needed to fulfill contracts for necessary expenses for the concerts to go forward. However, the exhibits defendant offers to support his argument fail to show that funds from that $450,000 were actually used to fulfill those contracts as he alleges.

3

For the reasons in this response and in the government's sentencing memorandum and brief, defendant's loss arguments lack merit. The Court should overrule his objection to the fourteen-level increase under USSG §2B1.1(b)(1)(H).

### III. The Court Should Not Depart Downward

Defendant moves the Court to depart downward under USSG §5K2.20 because his offense represented "aberrant behavior." (Doc. 30 at 2). USSG §5K2.20 provides, in relevant part, "a downward departure may be warranted in an exceptional case" "only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life."

However, "[t]he offense must have been more than something out of the defendant's character; it must have been a spontaneous and thoughtless act." *United States v. Bueno*, 443 F.3d 1017, 1023 (8th Cir. 2006). This is why "a fraud scheme generally would not meet such requirements because such a scheme usually involves repetitive acts, rather than a single occurrence or single criminal transaction, and significant planning." USSG §5K2.20 comment, (n.2).

Defendant pled guilty to a scheme to defraud the lending bank. Such behavior was neither spontaneous, nor thoughtless. Moreover, defendant's criminal behavior was not limited to a "single criminal transaction." Defendant admits he sent a fraudulent Newbo Evolve budget to the lending bank in support of GoCR's request for additional funding for Newbo Evolve on July 16, 2018. *See* (Objection to PSR ¶ 19, PSR ¶ 26). In addition, on June 11, 2018, defendant sent a fraudulent

4

Newbo Evolve budget to an entirely different lender. (Ex. 7). Moreover, after defendant's offense, he made false statements to the FBI in violation of 18 U.S.C. § 1001. (PSR ¶ 37). Because defendant's criminal conduct included defrauding and attempting to defraud two separate lenders and making false statements to federal agents, a departure under USSG §5K2.20 is inappropriate.

Further, while defendant has only one criminal history point, he has two adult criminal convictions involving alcohol. (PSR ¶¶ 54, 55). In 1986, defendant was convicted of public intoxication. (PSR ¶ 54). In 2012, defendant was convicted of operating while intoxicated after officers responded to a report of a possible drunk driver and located defendant driving a car that was weaving in its lane and crossing the fog line. (PSR ¶ 55). Defendant failed field sobriety tests and blew .158, nearly twice the legal limit. (PSR ¶ 55).

Based the nature of offense and his criminal history, defendant's criminal conduct is not sufficiently aberrant to warrant a downward departure under USSG §5K2.20.

## IV. The Court Should Not Vary Downward

Defendant asserts three additional grounds for an adjustment downward from the sentencing guidelines range. As explained below, not one of these grounds warrants a downward variance.

First, defendant claims he did not commit the offense for personal financial gain and thus he should be rewarded with a reduced sentence. True, the proceeds of defendant's fraud did not flow directly into his own coffers. However, defendant's

5

employment and professional standing were personal benefits that he sought to keep through the commission of his offense. Informing the lending bank of the true financial status of Newbo Evolve would likely have resulted in its cancellation, leaving defendant's organization with steep debts and public humiliation. Defendant's job would have been in peril and, as the GoCR's finance director, his skills and management would have been called into question. He likely would have been fired. Rather than confronting the problem, defendant committed fraud in the hope that he could maintain his position and avoid exposing his inexperience and criminal behavior. Defendant's shortsighted focus on his personal situation had widespread consequences, causing GoCR to collapse, the lending bank to lose nearly $1.5 million, and 97 other vendors to collectively lose $800,000. A downward variance is not warranted merely because defendant did not line his own pockets with the proceeds of his fraud.

Next, defendant argues that the amount of loss as calculated in the PSR overstates the seriousness of his offense. To the contrary, the PSR appropriately holds defendant accountable for the actual loss caused by his fraudulent conduct, $1,442,231.25. (PSR ¶ 40). If anything, the amount of loss is understated. This amount does not include the $800,000 that 97 vendors who provided services for Newbo Evolve lost, the embarrassment brought to the City of Cedar Rapids, and the shuttering of GoCR, the City's tourism bureau. (PSR ¶ 39). Defendant argues he did not intend any loss; he intended "to see the lending institution made whole" through his offense. (Doc. 30 at 5). But defendant knew how much money GoCR

6

had borrowed from the bank for Newbo Evolve. He also knew there was no possibility that Newbo Evolve would be profitable, as he stipulated, he knew that Newbo Evolve "was going to lose at least $640,000 and likely much more." (Doc. 14 at 8, 9 ¶¶ 13.Q 13.V). Contrary to his current claims, he also stipulated that he knew the representations regarding projected concert sales income were false. (Doc. 14 at 8, 9 ¶¶ 13.Q 13.V). The amount of loss scored in the PSR is a direct consequence of defendant's crime. This amount, $1,442,231.25, demonstrates the seriousness of defendant's offense. The high amount of loss that defendant caused does not warrant a downward variance.

Lastly, defendant asserts he is rehabilitated because he is currently employed. Maintaining employment is not exceptional. In fact, because defendant is on release under the Court's supervision and working is a condition of his release, defendant's employment is required. (Doc. 12 at 3). There is nothing about defendant's status as an employed person that merits a downward variance.

Additionally, post-offense rehabilitation is already accounted for in the adjustment for acceptance of responsibility. *See United States v. DeShon*, 183 F.3d 888, 889 (8th Cir. 1999) (explaining, in the context of a motion for a downward departure, that the "acceptance-of-responsibility guideline already takes post-offense rehabilitation efforts into account," and therefore, "departure under §5K2.0 is warranted only if the defendant's efforts are exceptional enough to be atypical of the cases in which the acceptance-of-responsibility reduction is usually granted").

Nothing about defendant's acceptance of responsibility or his other circumstances is exceptional.

In short, defendant has not identified any circumstances that take his case outside the heartland of the guidelines.

## V. Conclusion

As explained above, the Court should overrule defendant's objection to the fourteen-level increase in USSG §2B1.1(b)(1)(H).  Additionally, based on the serious nature of defendant's offense and the other factors in 18 U.S.C. § 3553(a), the Count should deny defendant's motion for a downward departure and a downward variance and impose a sentence within the guidelines range.

Respectfully submitted,

TIMOTHY T. DUAX
United States Attorney

By: */s/ Kyndra Lundquist*

KYNDRA LUNDQUIST
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, IA  52401-2101
319-363-6333
Kyndra.Lundquist@usdoj.gov

CERTIFICATE OF SERVICE
I hereby certify that on February 13, 2023, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the parties or attorneys of record.
UNITED STATES ATTORNEY
BY: /s KAL_____

8