IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DOUG HARGRAVE,<br><br>Defendant. | NO. 22-CR-00001<br><br>**DEFENDANT'S RESISTANCE TO GOVERNME'T'S SENTENCING BRIEF AND RESPONSE GOVERNMENT'S RESISTANCE TO DEFENDANT'S SENTENCING MEMORANDUM AND MOTIONS** |

COMES NOW, Defendant Doug Hargrave, by and through his counsel, and files this Resistance to the Government's Sentencing Brief (Doc. 37) and Response to the Government's February 13, 2023 Resistance to his Sentencing Memorandum and Motions for Downward Departure and Variance (Doc. 38).

**I. Defendant Exhibits**

D-1.   Outstanding Payments

Y.   Defendant's Email Requesting $225,000 Disbursement

Z.   January Bank Statements

AA.   UCC Filings

BB.   Cash Flow Projections (FINAL) – update 9-30

**II. Calculation of Loss**

1. <u>Kelly Clarkson Sales</u>. Defendant does not dispute that GoCR "never calculated the Newbo Evolve profits and losses by artist." Doc. 30, p. 2. The relevance of the calculations specifically accounting for money paid for and revenue generated by Kelly Clarkson's performance

1

is regarding the first fraudulent loan of $250,000, which was necessary in order to pay Ms. Clarkson and secure her performance at the event. Defendant is attempting to assess what happened to this exact $250,000 loaned by the bank due to his criminal conduct and used to pay Ms. Clarkson. Defendant acknowledges that the government's calculation of net revenue from the performance is more accurate; Government's Exhibit 13 is a document that Defendant had not found in discovery, and appears to present a cleaner accounting of revenue from the Kelly Clarkson performance than Defendant's Exhibit C, including accounting for sales tax as pointed out by the Government.

Accepting as a more accurate accounting the Government's calculated net revenue of $232,029.12, the Government still misunderstands Defendant's contentions on this point.

Ms. Clarkson appears to have been paid the first $250,000 installment towards her contract price in April, or at the very least May, of 2018.[1] This payment would have been made using funds from either the bank's original loan of $1.5 million or the $500,000 in funds from the City of Cedar Rapids. Pursuant to her contract terms, this is money that would *never* be returned to GoCR (or the bank) if it did not pay the second installment. In that event, Ms. Clarkson had the contractual right to refuse to perform and retain all funds previously paid to her. *See*, Exhibit B. The $232,029.12 in net revenue from her ticket sales would not have materialized if she had not been paid her second installment of $250,000.00, and there is simply no factual scenario known to Defendant, aside from Ms. Clarkson's *own* wrongful refusal to perform under the contract, in which that $250,000.00 paid to her would be returned to GoCR. The net revenue should therefore be viewed as a mitigation of the Bank's loss resulting from its extension of an additional $250,000 in credit as a result of criminal fraud, resulting in a net loss, using these numbers, of $17,970.88.

---

[1] Ms. Clarkson's contract provides that the first payment is due prior to any advertisement of her performance. Exhibit B, p. 1.

2. <u>The Pre-Fraud Loan Disbursement</u>. The Government argues in its Sentencing Brief (Doc. 37) that the $225,000 payment made by the Bank to GoCR on June 14, 2018 should be counted as loss. However, this argument fails for a number of reasons. As a factual matter, the $225,000 did not come entirely from the $1.5 million line of credit negotiated in December 2017 for Evolve. Bank staff indicate in their emails regarding the disbursement that $125,000 came from that line of credit, but $100,000 came from a different "operating" line of credit that GoCR had separately negotiated with the bank. As a result, taking the balance of the Government's argument for granted, the loss involved in this event would only be $125,000, as only that amount is at all related to the fact pattern discussed by the Government.

It also fails as a matter of law. The payment was not in any way an "advance," or in other words a new loan, as it is characterized by the Government. Doc. 37 at 4. It was a disbursement of credit available as part of the previously arranged loan with the bank, and *not* as a result of either of the two loans that were later fraudulently obtained. Defendant requested this disbursement under the existing lines of credit without making any fraudulent representations, only stating that the money was needed to pay for insurance and to pay Kelly Clarkson. The Government has introduced no evidence that these statements were false when made.

The Government makes much of the facts that 1) Defendant was aware of a projected loss at this time and 2) Defendant sent a fraudulent budget to a different party on June 11, 2018. Neither of these facts establish the commission of bank fraud under 18 U.S.C. § 1344. As noted, Defendant did not make a false statement to the Bank in requesting the disbursement of money the Bank had already committed to advancing under a line of credit, and the Government cites no authority for holding that an *omission* consisting of withholding information regarding a projected loss is a false statement punishable under § 1344. As to the sending of a false statement to a third party, the

Government has introduced no evidence that said party was an insured financial institution as required under § 1344, and has also not suggested that any funds were advanced by that entity to result in a criminal loss on its part.

It appears that the Government implicitly argues that Defendant violated § 1344 in this conduct by failing to inform the bank that GoCR was facing a new financial reality compared to when it applied for the $1.5 million line of credit it was now drawing from. However, an omission of facts, even if material, is not conduct forming a "scheme to defraud" under § 1344 when it is a mere nondisclosure and not part of an affirmative or active attempt to hide those facts. *See*, *U.S. v. Steffan*, 687 F.3d 1104 (8th Cir. 2012). In that case, the defendant was accused of improperly selling collateral promised to a bank; the prosecution argued that failing to disclose the state of the collateral once it was compromised was a misrepresentation indictable under § 1344. *Id.* at 1107-08. The district court dismissed the case on the defendant's motion for failure to state an offense. *Id.* at 1107. On appeal, the Eighth Circuit held that while a "scheme to defraud under section 1344(1) does not require an affirmative misrepresentation," there is a difference between "passive" and "active" concealment. *Id.* at 1113, 1115. The former is not sufficient for criminal liability, and therefore the indictment failed because it "fail[ed] to allege any acts to conceal" but rather alleged "only nondisclosure." *Id.* at 1115.

In this case, it appears that the Government suggest that because Defendant knew on June 14, 2018 of the projected $1.1 million loss, his request of an additional $225,000 from the Bank on that date was a violation of § 1344, and the forwarded amounts can therefore be calculated as loss resulting from criminal conduct. This suggestion, however, does not hold up under the Eighth Circuit's application of the statute.

    3. <u>Use of the Final Loan's Proceeds</u>. Finally, the Government argues that there is no

evidence that the $450,000 loan proceeds were used to pay necessary expenses. Doc. 38 at 3. In support of his argument, Defendant would refer to Exhibit D-1 filed herewith, which is a spreadsheet that appears to be an internal GoCR document prepared to track outstanding expenses in the aftermath of the Evolve festival. None of the companies or acts listed as exemplary necessary expenses in Defendant's Sentencing Memorandum are listed here as unpaid creditors, suggesting that they were in fact paid. Doc. 31 at 12; Defendant's Exhibit D-1, Outstanding Payables. As for the assertion that the $450,000 funds were specifically used to pay these expenses, it seems beyond dispute that GoCR lacked the funds needed to put on the event in the month, weeks, and days preceding August 3, and that Defendant and McCreight obtained the fraudulently-induced loans for this reason. *See, exe.*, Doc. 21 at 7-8.

While the Government may be correct in pointing out relatively minor calculation errors by defense counsel, its primary arguments attacking the Defendant's arguments regarding amounts of loss are not supported by law or fact.

**III. Departure**

The Government resists an aberrant behavior departure under USSG § 5K2.20 due to the alleged "significant planning" and "duration" involved in the criminal conduct. As noted by Defendant, courts have previously held that an aberrant behavior deviation is appropriate in the case of, for example, a four-month-long check-kiting scheme. *See*, Doc. 30 at 3; *U.S. v. Suarez-Reyes*, 2012 WL 6597814. Defendant's conduct, however, appears to have taken place during the course of approximately one month. Defendant sent the fraudulent budget to the Bank on or about July 16, 2018, and received the additional loan of $250,000 on July 19th. Doc. 21 at 8. The second fraudulent loan was made on or about August 1, 2018. Defendant's crime was of significantly less planning and duration than, for example, a check-kiting scheme conducted over a period of four months.

5

The Government also argues that despite the fact that Defendant admittedly "has only one criminal history point," the Court should refuse a deviation because "he has two adult criminal convictions involving alcohol." Doc. 38 at 5. The Government cites no authority for the Court using the 1986 simple misdemeanor conviction for public intoxication to find that Defendant has not led "an otherwise law-abiding life." It does not count towards his criminal history points calculation, which USSG § 5K2.20(c)(4) specifically points to as a criteria for determining whether a defendant is eligible for the deviation.

**IV. Variance**

Defendant believes that his previous filings are mostly sufficient to answer the Government's arguments presented regarding variance, and maintains that it is appropriate for the Court to consider a downward variance in his case. However, one additional point seems necessary regarding Defendant's employment.

The Government asserts that Defendant sought personal gain by his criminal conduct in that he was seeking to keep his job at GoCR, speculating that if the event was not a success he would lose this job and suffer negative consequences in his career. Doc. 38 at 5-6. The facts do not show this to be the case. First of all, even after Evolve failed spectacularly, Defendant was retained at GoCR as it attempted to restructure and move forward under its new debt load. A Cash Flow Projection sheet prepared in September of 2018, in projecting payroll expenses, assumed that Defendant would be an employee of GoCR for the foreseeable future. Defendant's Exhibit BB, Cash Flow Projections (FINAL) – update 9-30.[2] Additionally, Defendant had enjoyed a relatively successful career prior to his work for GoCR and presumably would absorb the loss of this job fairly

---

[2] This exhibit, like all of Defendant's exhibits except for Exhibit X, is recovered from discovery provided by the Government. Other parts of this spreadsheet not relevant to the matter addressed have been omitted.

6

easily. After all, he had only been employed by GoCR for a few months at the time it folded.

**V. Conclusion**

Defendant would argue that sentencing matters in this case primarily revolve not around factual disputes, but rather disagreements as to what legal conclusions follow from the facts. He maintains that, on balance, his Sentencing Memorandum offers a more reasonable interpretation of the complex financial transactions and consequences that form the body of facts in this case. In arguing for higher restitution amounts, the Government's pleadings appear to oversimplify matters and overlook important details such as the nature of each individual loan, what specific conduct by Defendant was criminal in nature, what consequences followed from that conduct and from other noncriminal factors, and the appropriate accounting for expenses and revenue amounts when looking at the aftermath of the Newbo Evolve festival.

If a simpler accounting is necessary, there is a more reasonable alternative than argued by Government or Defense counsel. It appears to be undisputed that the Bank recovered $757,768.75 after the festival, which was money placed in GoCR's account due to generation of revenue at the event. Doc. 37 at 12. The Bank committed in December 2017 to loaning $1.5 million, and no fraud was involved in securing that line of credit. In July and August of 2018, Defendant and Mr. McCreight fraudulently induced the Bank to loan an additional $700,000. The bank's recovery of $757,768.75 would not have occurred in a fact pattern where Defendant and McCreight did not defraud it and it decided to pull out without investing more money.

In that event, Ms. Clarkson would have cancelled; Maroon 5 and other music acts would not have performed because there would have been no stage, security, production, or other necessary provisions for concerts; in short, there would have been $0 in revenue. There is no fact pattern that Defendant can hypothesize under which the Bank *does not* advance additional money

but *does* recover from generated revenue. It is therefore counterfactual to argue that the recovered funds should be applied to the $1.5 million that the Bank was, in retrospect, always going to lose. Therefore, the simplest, most straightforward way to view these facts is to say that the Bank loaned $1.5 legitimately, loaned $700,000 due to criminal activity, recovered $757,768.75 that would not have been generated absent the subsequent loans, and ended the unfortunate affair $57,768.75 ahead of where it would have been if it had instead refused to loan the additional funds.

Defendant maintains that for the reasons argued in his Sentencing Memorandum and in support of his Motion for Downward Departure and Downward Variance, the Court should find that loss and restitution are significantly lower than as argued by the Government and that a departure and/or variance is appropriate in this matter.

Respectfully submitted,

CERTIFICATE OF SERVICE

I hereby certify that on **February 15**, **2023**, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will send notification of such filing to the following:

*Kyndra Lundquist, AUSA*

By: */s/ Lori Manson*

　/s/ *Stephen A. Swift*　
Stephen A. Swift     AT0007751

　/s/ *Austin G. Collins*　
Austin G. Collins     AT0014208
KLINGER, ROBINSON & FORD, L.L.P.
401 Old Marion Road NE
P. O. Box 10020
Cedar Rapids, IA 52410-0020
(319) 395-7400
(319) 395-9041 (Facsimile)
ATTORNEYS FOR DEFENDANT